169 P.3d 730 (2007)
2007 OK CIV APP 97
In the Matter of S.A., S.T., J.T., and J.T., Deprived Children.
State of Oklahoma, Petitioner/Appellee,
v.
Joe Tambunga and Lori Tambunga, Respondents/Appellants.
No. 104,333.
Court of Civil Appeals of Oklahoma, Division No. 1.
September 7, 2007.
Shera D. Shirley, Enid, OK, for Appellants.
Stephanie Hampton, Assistant District Attorney, Enid, OK, for Appellee.
Russell N. Singleton, Enid, OK, for Deprived Children.
Released for Publication by Order of the Court of Civil Appeals of Oklahoma, Division No. 1.
KENNETH L. BUETTNER, Judge.
¶ 1 Respondents/Appellants Joe Tambunga (Father) and Lori Tambunga (Mother) (collectively Parents) appeal from a jury verdict terminating their parental rights to S.A., S.T., J.T., and J.T. (Children). The jury found Parents' rights should be terminated under 10 O.S.2001 § 7006-1.1(A)(5) because Parents failed to correct the conditions leading to the deprived adjudication, and under 10 O.S.2001 § 7006-1.1(A)(15) because Children had been in foster care for fifteen of the most recent twenty-two months. The jury also found termination was in Children's best interests. Clear and convincing evidence supports the jury's verdicts and we affirm.
¶ 2 Petitioner/Appellee State of Oklahoma (State) filed its Petition seeking to have Children adjudicated deprived June 30, 2004. State alleged Children did not have proper parental care and that the home was unfit due to neglect, abuse, cruelty, or depravity.[1] At that time, Children remained in Parents' home.
¶ 3 State sought an emergency order to take Children into custody August 18, 2004.[2] Following a hearing, the trial court placed Children in State custody August 20, 2004. State then filed an Amended Petition for deprived adjudication August 24, 2004.[3]
*732 ¶ 4 After hearing on the deprived Petition, held October 14, 2004, the trial court entered an order on a standardized form entitled, "Adjudication Journal Entry." The trial court placed an "X" next to the printed words "The child(ren) is/are DEPRIVED based on the following findings of fact: as per Petition:" and in the following blank space the trial court handwrote "State has sustained a majority of allegations in Petition."[4] The transcript of the hearing on the Petition for deprived adjudication shows the trial court explained his findings on the allegations proved:
Court: . . . Well, let me just go through the substantive allegations in Paragraph 3.[5]
The State has sustained its burden of proof as to paragraph 3 A.
On 3 B, I don't know if Family Life Day Care is the same as Head Start, but in any event, the substantive allegations of 3 B have been sustained by the evidence, at least as to the odor and the dirty condition of the children.
I don't think C has been proven.
D has been proved.
E has been proved.
F has been proved.
G has been proved.
I'm not sure what E means, so I'll just skip that one.
So the bottom line is the majority of the substantive allegations of the State have been proved overwhelmingly and that the children do not have proper parental care.
I'm going to find that they are deprived children.
Finally, the trial court found that making Children wards of the court was in Children's best interests. Parents did not appeal the deprived adjudication, and the trial court's findings in that order are final.
¶ 5 The trial court entered a "Dispositional Journal Entry" October 29, 2004. In that order, the trial court checked the following language "reasonable efforts have been made to return the child(ren) to the home as follows: Parents will work treatment plan." The disposition order indicated the permanency plan was eventually to return Children to the home. The trial court ordered the attached Individualized Service Plans (ISP) as the treatment plans for Parents. The ISPs listed the reasons for DHS involvement[6] and then provided,
Condition(s) which need to be corrected:
(Parents) need to correct the conditions listed above. (Parents) will protect their children from any physical or emotional harm, making sure the children are not in the presence of Domestic Violence.
Desired Result(s):
(Parents) will keep the children free from harm and will not expose the children to Domestic Violence. They will attend Domestic Violence and Parenting classes. They will attend individual and family counseling. They will learn age appropriate parenting skills and be able to demonstrate these skills. They will maintain *733 contact with the worker and notify the worker of changes in living, counseling, therapy, job, phone number and situation.
Mother's and Father's ISPs then listed 14 specific "to do" items directing them to take action to correct the conditions. The ISPs included the statutory warning that failure to provide a safe home would result in termination of parental rights. Mother and Father signed the plans.
¶ 6 On September 15, 2005, DHS returned the two youngest Children to Parents' home for a trial reunification.[7] In March or April 2006, those two were removed again because the home did not appear safe, the children were filthy, domestic violence continued, and the conditions had not improved.[8] The record does not indicate that the two oldest Children returned to Parents' care at any time during these proceedings.
¶ 7 State filed its Application for Termination of Parental Rights September 11, 2006. State alleged Parents had failed to correct the conditions which led to the deprived adjudication, Children had been placed in foster care for fifteen out of the most recent twenty-two months preceding the filing of the Application, and that termination was in Childrens' best interests.
¶ 8 Jury trial was held January 17-18, 2007. The jury entered 16 separate verdicts in favor of termination: one for each parent and child on failure to correct conditions, and one for each parent and child on the ground of being in foster care for 15 of the previous 22 months. In each verdict form, the jury also found termination was in the child's best interests.
¶ 9 The trial court entered its Order Terminating Parental Rights January 24, 2007. Parents appeal. Appellate review of parental rights termination cases requires ". . . canvassing the record on review to ascertain whether nisi prius fact findings rest on clear-and convincing proof." In the Matter of S.B.C, 2002 OK 83, ¶ 6, 64 P.3d 1080, 1081. "We will affirm the factfinder's decision only where the record contains evidence from which the jury could reasonably have determined that the State satisfied its burden with clear and convincing evidence." In the Matter of C.J., 2005 OK CIV APP 66, ¶ 9, 121 P.3d 1119, 1121, citing In the Matter of C.R., 2003 OK CIV APP 14, 63 P.3d 573.
¶ 10 Termination of parental rights is governed by 10 O.S.2001 § 7006-1.1.[9] Parents contend the trial court failed to order specific *734 conditions Parents had to correct in order to be reunited with Children and that the termination order therefore violated their constitutional rights to due process. The Oklahoma Supreme Court has recognized that the right of a parent to the care, custody, companionship and management of his or her child is a fundamental right protected by the federal and state constitutions, requiring that the full panoply of procedural safeguards be applied before a parent may be deprived of that right.[10]
¶ 11 Parents assert the ISPs were insufficient to advise them of the conditions to be corrected. Title 10 O.S.Supp.2006 § 7003-5.3 outlines the requirements for individualized service plans. Parents argue the ISPs in this case failed to comply with § 7003-5.3(D)(2), (D)(3), (D)(6), (D)(10), and (J).[11] Parents admit the ISPs included a general description of the services to be provided to Parents, but they complain the plans lacked the means by which the services would be offered as well as a schedule of the frequency *735 of the services. Parents also complain the ISPs lacked performance criteria to measure their progress. Parents complain the ISPs failed to include documentation of steps DHS was taking to place Children "in another planned permanent living arrangement." Parents next allege the plans do not include "clearly defined objections" or "outcome based performance criteria" so that "any termination based on the `failure' to complete the ISPs violates (Parents') Due Process Rights."
¶ 12 The individual treatment and service plan, prescribed by 10 O.S.Supp.2006 § 7003-5.3 and approved by the trial court, is the method used to advise the parents of the standards of conduct expected of them in order to correct the conditions leading to the deprived adjudication. While failure to perform the service plan is not of itself grounds to terminate parental rights, the parties use compliance or non-compliance with the plan as evidence showing whether the conditions leading to the adjudication have been corrected. In Re J.M., 1993 OK CIV APP 121, 858 P.2d 118, 120. We disagree with Parents' assertion that termination was based on failure to complete the plan. The jury found Parents failed to correct the conditions leading to the deprived adjudication, as required by statute before terminating parental rights.
¶ 13 The record shows Parents received trial court-approved individual treatment plans which explained the conditions Parents were charged with correcting in order to regain custody of Children. Additionally, at the hearing on the deprived Petition, the trial court announced to the parties in open court which conditions led to the deprived adjudication. Parents were therefore on notice of the conditions to be corrected. And, Parents failed to challenge the deprived adjudication by appeal. The facts presented by the record here do not show a denial of due process in the notice given Parents of the conditions which led to the deprived adjudication and of the steps required for Parents to show they had corrected those conditions. The clear and convincing evidence shows Parents failed to correct those conditions and the jury verdicts on that ground are affirmed.
¶ 14 In their second assertion of error, Parents claim there was insufficient evidence to support termination of parental rights under § 7006-1.1(A)(15). That subsection allows termination of parental rights where the child has been in foster care for 15 of the most recent 22 months. Parents concede Children were in foster care for 15 of the 22 months preceding the Application for Termination of Parental Rights. Parents assert they were not at fault for the length of time Children remained in foster care. Parents rely on two cases holding that where the State has contributed to the parents' failure to correct the conditions, termination based on length of time in foster care is unwarranted. See Matter of M.J. & J.J, 2000 OK CIV APP 75, 8 P.3d 936 and Matter of J.M., 1993 OK CIV APP 121, 858 P.2d 118.
¶ 15 Matter of M.J. & J.J. affirmed a jury's decision to terminate parental rights on the basis of length of time in foster care. There, the mother complained that the statute allowing termination based on time in foster care unconstitutionally denied her right to present defenses, such as the state contributing to the duration of foster care. The court noted the mother had not challenged the fact that her children had been in foster care for more than 15 months, nor did she argue the state had contributed to the length of time the children were in foster care. Instead, she contended § 7001-1.1(A)(15) was essentially a strict liability statute. The court addressed the possible defenses in rejecting the mother's argument: "(t)hese include, but are not limited to, adequacy of notice of either commencement of proceedings, or the conditions in need of remediation, or the terms of the service plan, or the consequences of failure to correct the conditions leading to the deprived adjudication." Id. at ¶ 10. The court affirmed based on the jury's findings that the children had been in foster care for 15 of the most recent 22 months and that termination of parental rights was in the children's best interests. The court quoted an earlier finding on the rationale behind § 7006-1.1(A)(15):
where reasonable efforts to return the adjudicated deprived child(ren) to the parent(s) have proved fruitless as to result in *736 prolonged foster care placement of the child(ren), the Legislature clearly viewed extended placement in foster care, without progress toward reunification of the family, to be so detrimental to those children's best interests as to justify termination of parental rights. The Court of Civil Appeals has recognized this provision as reasonably related to valid state interests and not unconstitutional per se. Matter of M.C. and N.C., 1999 OK CIV APP 128, 993 P.2d 137.
Id. at ¶ 10.
¶ 16 Matter of J.M. is clearly distinguishable and does not support Parents' argument. J.M. did not involve termination based on length of time in foster care, but based on failure to correct conditions. There the father was denied the plan-ordered treatment for sexual abuse because he would not admit to sexual abuse. The court found the plan unconstitutionally required the father to incriminate himself to follow the plan. Id. at ¶ 7. Additionally, one counselor unilaterally terminated the parents' therapy when the counselor stopped work at the counseling center. The counselor did not refer the parents to another counselor.
¶ 17 The Court of Civil Appeals found the treatment plan was impermissibly modified or abrogated by treatment providers rather than the trial court. Id. at ¶ 10. The facts of J.M. show the treatment providers directly contributed to the parents' failure to complete the treatment plan (the appellate court also noted that failure to complete the plan is not a ground for termination).[12]
¶ 18 In this case, we have noted above that Parents were given sufficient notice of the conditions to be corrected. Parents have not asserted that the State or treatment providers thwarted their ability to correct those conditions. The clear and convincing evidence showed that Children were in foster care for 15 of the most recent 22 months before the Application for Termination of Parental Rights. The jury found that element as well as that termination was in Children's best interests. We find no error in the jury's finding on that ground.
¶ 19 Finally, Parents continue to misapprehend that the test for termination is "completing the treatment plan." Parents argue clear and convincing evidence does not support the finding that termination was in Children's best interests because Parents "substantially completed their ISP." As noted above, the plan is used to help parents correct the conditions leading to the deprived adjudication. In all termination cases, whether failure to correct conditions is alleged or not, the paramount concern is the health, safety, welfare, and best interests of the children. 10 O.S.Supp.2006 § 7006-1.1(A). The evidence leading to removal shows that Parents home was not safe for Children: Parents neglected Children's basic hygiene needs as well as their needs to be safe from physical harm, and exposed Children to domestic violence. We have reviewed the trial transcript and find the clear and convincing evidence at trial showed termination of parental rights was in Children's best interests.
AFFIRMED.
BELL, J., concurs, and HANSEN, J., dissents with a separate opinion.
CAROL M. HANSEN, J., dissenting:
¶ 1 I dissent because Parents' rights were terminated in the absence of the full panoply of procedural safeguards due to them in a termination proceeding. The Oklahoma Supreme Court has repeatedly recognized that the right of a parent to the care, custody, companionship and management of his or her child is a fundamental right protected by the federal and state constitutions, requiring that the full panoply of procedural safeguards be applied before a parent may be deprived of that right. In Re Adoption of D.T.H., 1980 OK 119, 615 P.2d 287, 290 (overruled on *737 other grounds). The process due in a termination proceeding includes notice by the trial court of the parental conduct norms which the parent must follow to regain legally unencumbered standing as a parent. The prescribed norms of parental conduct must be stated with judicial clarity in order to preserve the procedural safeguards mandated by state and federal due process. A lack of specificity renders these fundamental-law guarantees meaningless. In Re C.G., 1981 OK 131, 637 P.2d 66, 69.
¶ 2 The trial court in this case failed to provide the required judicial clarity in advising Parents of the conditions leading to Children being adjudicated deprived. At the adjudication hearing, the trial court stated which allegations of the petition it found proved. However, it failed to place those findings in its journal entry, stating instead, "STATE HAS SUSTAINED A MAJORITY OF ALLEGATIONS IN PETITION." This language leaves doubt as to which of the allegations were proved and which were not. The trial court's adjudication order fails to provide Parents the requisite notice of the conditions leading to Children's' adjudication as deprived children. The majority appears to view the trial court's oral statement at hearing as sufficient notice of the conditions leading to deprived adjudication. In the absence of any showing Parents received a memorialization of those findings, I cannot agree.
¶ 3 The individual service plan (ISP) also lacks a clear statement of the conditions leading to deprived adjudication. At most, it can be construed to give notice that Children were adjudicated deprived because of domestic violence. However, at trial, State asserted other conditions leading to the adjudication had not been corrected. In particular, State's attorney argued Parents had not corrected the condition of Children being dirty and having an odor. She called as a witness Children's court-appointed special advocate, who testified she had supported returning Children to Parents until an incident in which she had hands-on experience helping two of the children change their clothes and discovered their basic hygiene needs were not being met. Other witnesses testified to Children's' odor. However, Parents' ISP made no mention of correcting any conditions relating to Children's' hygiene needs. It did not even address cleanliness of the home except to require that Parents keep it "free from clutter."
¶ 4 Although the ISP arguably identified domestic violence as a condition needing correcting, State put on no witness who testified to continuing domestic violence based on personal knowledge, except Mother and Father themselves. Mother testified Father had not hit her for three years but that she had bruises from "wrestling." Father testified they "trade punches . . . just for fun," causing bruises. Neither Parent seemed to consider bruise-causing conduct to be domestic violence when it was not done in anger. The ISP did not specify otherwise.
¶ 5 Not only did Parents lack a clear statement of the conditions they were required to correct, the jury also lacked such a statement. State's petition, the adjudication order, and the ISP were submitted into evidence, but were inadequate to inform the jury what conditions led to the deprived adjudication. The jury did not have access to the transcript of the adjudication hearing, upon which the majority relies. Furthermore, the jury instructions did not cure the deficiency, stating only that the jury must find the conditions which caused the child to be deprived have not been corrected.
¶ 6 The failure of the adjudication order to clearly identify the conditions leading to deprived adjudication and the failure of the ISP to clearly state the norms of parental conduct to which Parents would be held resulted in the lack of specificity that rendered notice meaningless. Termination of parental rights in the absence of adequate notice violated Parents' due process rights.
¶ 7 The lack of due process arising from an absence of a clear statement as to the conditions leading to the deprived adjudication prejudiced Parents' ability to cure the conditions and reunite the family, extending the amount of time Children spent in foster care. Therefore, termination of Parents' rights on the alternate grounds that Children had been placed in foster care for fifteen out of the most recent twenty-two months preceding *738 the filing of the petition must also fail on due process grounds. This fifteen-month provision does not trump lack of due process. Otherwise, State could hold children for any reason or no reason and terminate parental rights any time fifteen months had passed.
¶ 8 Parental rights were terminated in this case because the children were dirty. DHS never told Parents to bathe their children. It never provided services to Parents to improve the family's hygiene. I further point out there are no allegations of physical abuse of the children. I would remand with instructions to maintain Children's current placement while implementing an ISP directed to Children's personal hygiene.
NOTES
[1] The affidavit attached to the Petition indicated DHS began investigating when a daycare facility reported blood in J.T.'s diaper in April 2004. DHS received another referral in April 2004 alleging domestic violence between Parents. The affidavit also noted Father was subject to a protective order obtained by his mother-in-law, and Enid police had investigated Father for punching his father-in-law in April 2004.
[2] The Affidavit for Emergency Custody, prepared by DHS worker Kaycie Felix, indicated that in August 2004, Enid Police responded to a call in which Mother was at the local hospital and reported that Father was drunk and attacked her in the presence of S.A. and S.T. Mother sought a protective order against Father, but dismissed it a few days later in hopes that Father would return to the family home.

The affidavit further alleged that Mother had left Children in the care of her sister who had a confirmed DHS history in which all of the sister's children were removed from her home. At the time DHS went to Mother's sister's home to investigate the instant case, the worker learned S.A. and S.T. were staying overnight with their maternal grandparents. The affidavit alleged the existence of a confirmed DHS investigation of the maternal grandfather for molesting another grandchild in 2000, and the affidavit alleged Mother's sister reported he had molested her "all her life." The affidavit also alleged that on August 17, 2004, when DHS workers went to Mother's sister's home, S.A., S.T., and J.T. were playing in a pool, with 3 inches of standing water, without adult supervision. (At that time, S.A., S.T., and J.T. were 4, 3, and 2 years old, respectively). The affidavit asserted that the maternal grandparents and Mother's sister were inappropriate caregivers.
The affidavit also alleged that Mother reported to DHS investigators that she knew her sister had accused their father of molesting the sister, and that Mother partly believed her sister, but Mother continued to allow Children to stay with her parents at least 2 times per month.
Finally, based on continuing domestic violence and Mother's failure to protect Children, the affidavit requested emergency custody of Children for their safety.
[3] In Paragraph III of the Amended Petition, State listed the following grounds supporting a deprived adjudication:

A) Parents' home and yard contained several hazardous items and had a stale odor,
B) the staff of Family Life Daycare observed that Children were dirty and had an odor,
C) S.A. and S.T. disclosed to DHS and school staff that Parents hit each other and Father told S.A. and S.T. not to report the hitting,
D) Children were exposed to multiple acts of domestic violence in the home and Father was facing criminal charges involving domestic violence,
E) Mother was unwilling or unable to protect Children from violence in the home, and Mother dismissed the protective order she had obtained against Father,
F) Parents had placed Children with inappropriate caretakers,
G) Parents had failed to adequately supervise Children,
E) (sic) "See attached Affidavit for Deprived Petition . . . (and) attached Affidavit for Emergency Custody,. . . ."
[4] In the next section of the form, the trial court placed an "X" next to the language indicating the court found efforts to prevent removal or provide for the return of Children to the home "were not made because removal was due to an alleged emergency and was necessary for the child(ren)'s safety." This paragraph further provides that the court found the absence of efforts was reasonable under the circumstances "per petition."
[5] For the terms of Paragraph 3 of the Petition, see note 3, supra.
[6] The stated reasons were: (1) daycare workers found blood and a foul odor in J.T.'s diaper (and the examining pediatrician found no sign of sexual abuse, but could not rule out sexual abuse), (2) DHS received a domestic violence referral, in which S.A. and S.T. reported "daddy hits mommy and mommy hits daddy," which Mother denied, (3) Enid Police had "been involved with the residence," (4) charges were pending against Father for violence against Wife's mother, and (5) Father was accused of punching his father-in-law. The form stated "exposure to domestic violence was confirmed."
[7] Sharon Sneddon Carpenter, the DHS treatment worker, testified that DHS returned J.T. and J.T. because Parents were making progress with their treatment plans and things "seemed to be going really well."
[8] Carpenter visited the home at least once a month during the trial reunification and noticed J.T. and J.T. appeared not to have had a bath and smelled of urine, and had scratches and bruises. Carpenter further explained the clutter in the home presented hazards to the children, but Parents explained they did not have time to clean the house.
[9] That statute provides, in pertinent part:

§ 7006-1.1. Termination of parental rights in certain situations
A. Pursuant to the provisions of the Oklahoma Children's Code, the finding that a child is delinquent, in need of supervision or deprived shall not deprive the parents of the child of their parental rights, but a court may terminate the rights of a parent to a child in the following situations; provided, however, the paramount consideration in proceedings concerning termination of parental rights shall be the health, safety or welfare and best interests of the child:
* * *
5. A finding that:
a. the child has been adjudicated to be deprived, and
b. such condition is caused by or contributed to by acts or omissions of the parent, and
c. termination of parental rights is in the best interests of the child, and
d. the parent has failed to show that the condition which led to the adjudication of a child deprived has been corrected although the parent has been given not less than the time specified by Section 7003-5.5 of this title to correct the condition;
* * *
15. A child has been placed in foster care by the Department of Human Services for fifteen (15) of the most recent twenty-two (22) months preceding the filing of the petition. For purposes of this paragraph, a child shall be considered to have entered foster care on the earlier of:
a. the adjudication date, or
b. the date that is sixty (60) days after the date on which the child is removed from the home.
B. An order directing the termination of parental rights is a final appealable order.
(Emphasis added, emphasized language was added in 1998).
[10] The process due in a termination proceeding includes notice by the trial court of the parental conduct norms which the parent must follow to regain legally unencumbered standing as a parent:

Judicial clarity in the prescribed norms of parental conduct is essential to the preservation of the procedural safeguards mandated by state and federal due process. A "fair warning" requirement breathes life into these fundamental-law guarantees, while lack of specificity makes them meaningless.
* * *
Norms for parental conduct are designed to advise parents of what is expected of them qua parents and to guide them in avoiding patterns or a level of behavior that may trigger official intervention.
* * *
Notice which may be implicit in the adjudication-that one's general substandard parental behavior brought about the loss of the custodial rights-is not enough because it is of little utility in guiding a parent toward the expected conduct. A broad, amorphous concept of parental unfitness cannot be said to put one on notice of those conditions in one's present lifestyle in which the law requires one to make a change, nor does it give one a factual basis for an earnest effort at conduct modification.
In Re C.G., 1981 OK 131, 637 P.2d 66, 69.
[11] Those subsections provide, in pertinent part:

D. The individual treatment and service plan shall include, but not be limited to:
* * *
2. Identification of the specific services to be provided to the child including, but not limited to, educational, vocational educational, medical, drug or alcohol abuse treatment, or counseling or other treatment services, and identification of the services to be provided to the parent, legal guardian, custodian, stepparent, other adult person living in the home or other family members, to remediate or alleviate the conditions that led to the adjudication, including services needed to assist the family to provide safe and proper care of the child or to prevent further harm to the child;
3. A schedule of the frequency of services or treatment and the means by which delivery of the services or treatment will be assured or, as necessary, the proposed means by which support services or other assistance will be provided to enable the parent or the child to obtain the services or treatment;
* * *
6. Performance criteria that will measure the progress of the child and family toward completion of the treatment and service plan including, but not limited to, time frames for achieving objectives and addressing the identified problems;
7. A projected date for the completion of the treatment and service plan;
8. The name and business address of the attorney representing the child;
9. The permanency goal for the child and the reason for selection of that goal; and
10. a. In the case of a child with respect to whom the permanency plan is adoption or placement in other permanent placement, documentation of the steps the Department is taking to:
(1) find an adoptive family or other permanent living arrangement for the child,
(2) place the child with an adoptive family, a fit and willing kinship relation, a legal guardian, kinship guardian, or in another planned permanent living arrangement, and
(3) finalize the adoption or guardianship, kinship guardianship or other permanent placement.
b. Such documentation shall include, at a minimum, child-specific recruitment efforts such as the use of state, regional and national adoption exchanges, including electronic exchange systems.
* * *
J. The services delineated in the individual treatment and service plan shall be designed to improve the conditions in the family home and aid in maintaining the child in a safe home, to facilitate the return of the child to the family home, or to facilitate the permanent placement of the child. The plan shall focus on clearly defined objectives and shall provide the most efficient path to quick reunification or permanent placement. To the extent possible, the plan shall contain outcome-based evaluation criteria that measure success in the reunification or permanent placement process.
[12] See also In the Matter of C.R.T., 2003 OK CIV APP 29, ¶ 33, 66 P.3d 1004 (Held, error to instruct the jury on failure to correct conditions where the condition was a mental illness mother was unable to correct. "In the context of extended foster care, the evidence must also show that the parent bears the culpable responsibility for the fact that the child has been in foster care for the requisite period and that the parent is not the subject of an uncorrected condition which is by its nature beyond the parent's power to correct.")